## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **CHARTER TOWNSHIP OF PITTSFIELD, MICHIGAN, a Municipal Corporation, and COMMITTEE FOR PRESERVING COMMUNITY QUALITY, INC., a Michigan Not-for-Profit Corporation, and John and Jane Does 1-100** | **Case No.** <br> **Hon.** |
| **Plaintiffs,** <br> **v.** | **COMPLAINT** |
| **MICHIGAN DEPARTMENT OF TRANSPORTATION; BRADLEY C. WIEFERICH, in his capacity as Director, Michigan Department of Transportation; and the CITY OF ANN ARBOR, MICHIGAN,** | |
| **Defendants.** | |

Plaintiffs, Charter Township of Pittsfield ("Township" or "Pittsfield") and Committee for Preserving Community Quality, Inc. ("CPCQ"), by and through their undersigned counsel, hereby bring the following claims against Defendants Michigan Department of Transportation, Bradley C. Wierferich, in official capacity as Director of Michigan Department of Transportation (collectively, "MDOT"), and the City of Ann Arbor ("City" or "Ann Arbor"), as follows:

## INTRODUCTION

1.      This is an action to compel Defendant MDOT to comply with the Federal Aviation Act.(Title 49, U.S.C., subtitle VII, as amended), with the National Environmental Policy Act ("NEPA"), with the Clean Air Act, and with the regulations and orders implementing those statutes. This action also seeks to address Defendants, MDOT's and the City of Ann

Arbor's violations of Michigan state law, including the Michigan Environmental Protection Act. Specifically, Plaintiffs seek declaratory and injunctive relief to ensure that Defendants do not implement the Extension of Runway 6/24 at Ann Arbor Municipal Airport ("Project") - an expensive extension to the main runway at Ann Arbor Municipal Airport ("ARB" or "Airport") that is not needed for safe or efficient operation of the Airport, that has been opposed by the surrounding Townships and will have a significant impact on the environment - before complying fully with federal and state environmental laws.

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 2201, as this action presents cases and controversies under the National Environmental Policy Act of 1969, as amended ("NEPA"), 42 U.S.C. § 4321 *et seq*., the Federal Aviation Act, 49 U.S.C. Subtitle VII, the Clean Air Act, as amended, 42 U.S.C. § 7401 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., and 28 U.S.C. § 1346(a)(2), and 28 U.S.C. § 1391(e).

3.      This Court has supplemental jurisdiction over the pendent state claims pursuant to 28 U.S.C.A. § 1367.

4.      Venue is appropriate in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b)(1) and (2), because the proposed extension of Runway 6/24 at the Airport lies entirely within the Eastern District. In addition, Plaintiffs and Defendant City of Ann Arbor are located in the Eastern District and Plaintiffs and Defendants do business in the Eastern District. Furthermore, a substantial portion of the events or omissions giving rise to the claims stated herein occurred in the Eastern District. MDOT and its consultants

prepared the unlawful Environmental Assessment and violated the laws at issue in this Complaint.

5. Plaintiffs have no adequate remedy at law. Unless this Court grants the requested relief, the Defendants' actions will cause irreparable harm to the environment, to Plaintiffs and their interests, and to the public in violation of federal and state law and contrary to the public interest. No monetary damages or other legal remedy could adequately compensate Plaintiffs, or the public for these harms. Plaintiffs are persons adversely affected by agency action within the meaning of Section 702 of the Federal Administrative Procedure Act. 5 U.S.C. § 702.

6. The court may grant declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201 and 2202.

7. Defendants have taken final agency action and there exists an actual, justiciable controversy between Plaintiffs and Defendants.

**PARTIES**

8. Plaintiff, Charter Township of Pittsfield ("Pittsfield"), is a Municipal Corporation organized and existing under the laws of the state of Michigan with a population that exceeds 38,000 residents and municipal offices located at 6201 W. Michigan Ave., Ann Arbor, Michigan 48108-9721. Pittsfield is a "charter township."  Under Michigan law, a "charter township" is a municipal corporation that has been granted a charter, allowing it certain rights and responsibilities of home rule that are generally intermediary in scope between those of a city and a village, which is subject to the authority of the township in which it is located. A charter township has greater protection against annexation of a township's land by cities and villages. Pittsfield has established a variety of municipal services, such as a police force, fire department, assessors and is governed by a comprehensive zoning ordinance. Since ARB is within Pittsfield's

corporate jurisdiction, the township provides services to ARB, as well as being subject to the township's ordinances.

9.      Plaintiff, Committee for Preserving Community Quality, Inc., ("CPCQ"), is a Michigan not-for-profit corporation with its principal place of business located at 5221 Crooked Stick Drive, Ann Arbor, Michigan 48108. CPCQ is comprised of more than 2,000 citizens from Pittsfield, Lodi, and Scio Townships and the cities of Ann Arbor and Saline, who oppose the proposed expansion of the Airport, including resident members of the Stonebridge Community Association. CPCQ's members are concerned about the environmental, public safety, and other impacts of the Project, and have actively participated in all stages of the environmental review process for the Project. Among other things, CPCQ and its members have participated in the process of identifying, developing, and evaluating the potential impacts of the Project and of identifying alternative means of achieving the goals of the Project. They have commented on every publicly available document for the Project. Although CPCQ and its members have, through the NEPA comments process, suggested a number of reasonable alternatives to the Project, Defendants refused to consider those alternatives in detail in the Final Environmental Assessment for the Project (the "FEA"). Members of CPCQ, who reside and work in the communities surrounding the Airport, will be directly, indirectly, and cumulatively affected by the Project, thereby harming CPCQ and its members.

10.      Plaintiffs, John and Jane Does 1-100, are residents of the Township with residence addresses located in the Township.

11.      Defendant, Bradley C. Wieferich, is Director of the Michigan Department of Transportation, an agency of the State of Michigan, with a headquarters office located at 525 West Ottawa Street, Lansing, Michigan 48909.

-4-

12.     Defendant, Michigan Department of Transportation ("MDOT"), is an agency of the State of Michigan, with a headquarters office located at 525 West Ottawa Street, Lansing, Michigan 48909. MDOT approved the Final Environmental Assessment ("FEA"), signing the Finding of No Significant Impact/Record of Decision ("FONSI/ROD") for Runway 6/24 Extension at the Airport.

13.     Defendant, City of Ann Arbor ("City" or "Ann Arbor"), is a Municipal Corporation organized and existing under the laws of the State of Michigan with a population that exceeds 120,000 residents and municipal offices located at 301 East Huron Street, Ann Arbor, Michigan, 48104. Ann Arbor is the owner and operator of the Airport, which is wholly located within the jurisdiction of Pittsfield. As owner/operator of an airport that receives federal funds, it has a legal duty to comply with NEPA, the Clean Air Act, the Federal Aviation Act, and the regulations and orders implementing those statutes.

## APPLICABLE LAW

### NATIONAL ENVIRONMENTAL POLICY ACT

14.     NEPA is our nation's "basic charter for the protection of the environment." 40 C.F.R. § 1500.1. It establishes a national policy to "prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. The Act recognizes "the critical importance of restoring and maintaining environmental quality;" declares that the government has a continuing responsibility to use "all practical means" to minimize environmental degradations; and directs that "to the fullest extent possible … the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with [these] policies …" See 42 U.S.C. §§ 4331(a), 4331(b)(4), 4332(l).

15.     NEPA requires all federal agencies to prepare a "detailed statement" on every proposal for a major federal action which will or may significantly affect the quality of the human environment. 42 U.S.C. § 4332(C). NEPA defines the required elements of the "detailed statement" to include a detailed discussion of:

a.     reasonably foreseeable environmental effects of the proposed agency action;

b.     any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

c.     a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, which are technically and economically feasible, and meet the purpose and need of the proposal;

d.     the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

e.     any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

42 U.S.C. § 4332(C); *see also* 40 C.F.R. §§ 1502.13, 1502.14, 1502.16.

16.     NEPA regulations further require that in the statement an agency must identify the "purpose and need" of the proposed action. 40 C.F.R. § 1502.13. That statement of Purpose and Need effectively delineates the range of alternatives to be studied. If the Purpose and Need is too

narrowly stated, the statement cannot meet its obligation to evaluate and make available for public comment "all reasonable alternatives." 40 C.F.R. § 1502.14(a).

17.    Once the range of alternatives are delineated, the statement must "rigorously explore and objectively evaluate all reasonable alternatives" for achieving the general goals of the proposed action, 40 C.F.R. § 1502.14(a), and thoroughly analyze the environmental impacts of the proposed action and alternatives., 40 C.F.R. § 1502.16.

18.    The examination of alternatives "is the heart of the environmental impact statement." 40 C.F.R. § 1502.14. The statement must "rigorously explore and objectively evaluate all reasonable alternatives" including "reasonable alternatives not within the jurisdiction of the lead agency."  *Id*. § 1502.14(a), (c). "Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant." Council on Environmental Quality, "Forty Most Asked Questions Concerning the CEQ's Environmental Regulations," 46 Fed. Reg. 18,026, 1802 (March 23, 1981) (emphasis in the original). Reasonable alternatives must then be presented together with the proposed project "in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

19.    In evaluating the environmental impacts of "all reasonable alternatives," federal agencies must consider each and every reasonably foreseeable direct, indirect, and cumulative effect of a proposed action. 42 U.S.C. § 4332; 40 C.F.R. §§ 1502.10, 1502.14, 1502.16, 1508.7, 1508.1. Direct effects are "caused by the action and occur at the same time and place." 40 C.F.R. § 1508.1(g)(1). Indirect effects are "caused by the action" but are "later in time or farther removed in distance." 40 C.F.R. § 1508.1(g)(2). Indirect effects "may include growth inducing

effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id*. Cumulative effects are "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.1(g)(3). Cumulative effects "can result from individually minor but collectively significant actions taking place over a period of time." *Id*.

20.     The Council on Environmental Quality ("CEQ") has promulgated regulations governing the implementation of NEPA (the "CEQ NEPA Regulations"). *See* 40 C.F.R. parts 1500-1508. The CEQ NEPA Regulations are binding on all Defendants.

**THE CLEAN AIR ACT**

21.     The Clean Air Act, 42 U.S.C. §7401 *et seq*., requires the Environmental Protection Agency ("EPA") to set national ambient air quality standards ("NAAQS") to protect public health and welfare. 42 USC § 7409. EPA has adopted a NAAQS for fine particulates, known as PM2.5, lead, VOCs, and NOx. 40 C.F.R. § 50.13.

22.     The Clean Air Act further requires each State to adopt and submit to EPA a plan (a "state implementation plan" or "SIP") to attain these standards in areas that do not meet them and to preserve attainment in areas that do meet them. 42 U.S.C. § 7410.

23.     States may include in this plan "indirect source review" requirements that provide for the preconstruction review of "indirect sources that do not emit significant amounts of pollution themselves but that increase pollution by attracting mobile sources."  42 U.S.C. § 7410(a)(5).

24.     Section 176 of the Clean Air Act, 42 U.S.C. §7506(c), provides that no department, agency, or instrumentality of the federal government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of the Act. Assurance of conformity to such an implementation plan is an affirmative responsibility of the head of such department, agency, or instrumentality.

25.     Under EPA regulations, these conformity requirements apply to any project located in a non-attainment area that will have direct or indirect emissions that exceed certain specified thresholds. *See generally*, 40 C.F.R. Part 93.150-160. The regulations require determinations that a project conforms to a SIP to be made through a described process of public notice and comment.

26.     With respect to public health authority and environmental regulation, EPA's assessments should be given precedence over the FAA's pronouncements. For example, Congress did not delegate air pollution regulations to the FAA. *See*, *West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 729 (2022), citing *Kisor v. Wilkie*, 588 U.S. 558(2019) ("'When [an] agency has no comparative expertise' in making certain policy judgments, we have said, 'Congress presumably would not' task it with doing so")

## STATE BLOCK GRANT PROGRAM

27.     Michigan is one of ten states that administers the Federal Airport Improvement Program (AIP) grants under the FAA's State Block Grant Program (SBGP) which requires the states to comply with, among other things, "state and local environmental policy acts" and to ensure "critical safety and security needs." 49 U.S.C. § 47128(b)(4) and (c). The SBGP,

authorized under 49 U.S.C. § 47128, and 14 C.F.R., Part 156, requires, among other things, that

FAA issue a:

> ….
>
> (4)    finding that the State has agreed to comply with United States Government standard requirements for administering the block grant, including the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), State and local environmental policy acts, Executive orders, agency regulations and guidance, and other Federal environmental requirements; and
>
> (5)    finding that the State has agreed to provide the Secretary with program information the Secretary requires.

49 U.S.C. § 47128(a).

28.    Pursuant to that statutory provision, the State of Michigan and the FAA entered

into a Memorandum of Agreement ("MOA") in 1993. That MOA was replaced by an MOA in

2010, which expired by its own terms in 2015. Upon information and belief, there have been no

subsequent MOAs regarding the SGBP since 2010.

29.    Upon information and belief, Plaintiffs believe that MDOT relies on the 2010

MOA for compliance with the statutory requirement of 49 U.S.C. § 47128(a).

30.    The 2010 MOA states in ¶ 5 that "in carrying out this program, MDOT will

comply with all Federal laws, regulations and executive orders set forth in Attachment B. MDOT

also acknowledges awareness of FAA policy and guidance in the form of Orders which have

applicability to the state block grant program and are set forth in Attachment B…." 2010 MOA,

p.3.

31.    Included in the 2010 MOA's Attachment B are the following Federal laws:

> (1)    [Federal Aviation Act] Title 49, U.S.C., subtitle VII, as amended;
> …
> (9)    Clean Air Act, P.L. 90-148, as amended;
> …
> (21)    National Environmental Policy Act of 1969 – U.S.C. 4321 et seq.

2010 MOA, Attachment B, p.1.

## FAA GRANT ASSURANCE PROGRAM

32.     As part of the FAA's Airport Improvement Program in providing federal funds for the development of airports, the "sponsor" of an airport – usually the airport owner and/or operator – must sign a Grant Agreement that commits the airport sponsor to comply with the FAA's Airport Sponsor Grant Assurances.

33.     The first assurance mentioned in the Grant Assurances is that the Sponsor "hereby assures and certifies … that … it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Grant including but not limited to the following:

> a.      [Federal Aviation Act] 49 U.S.C. subtitle VII, as amended.
> …
> i.      Clean Air Act, P.L. 90-148, as amended – 42 U.S.C. § 7401, *et seq.*
> …
> v.      National Environmental Policy Act of 1969 – 42 U.S.C. § 4321, *et seq.*

Federal Aviation Administration, *Assurances: Airport Sponsors*, Assurance C.1.

34.     FAA Grant Assurance Six requires the project subject to the assurances "be reasonably consistent with plans (existing at the time of submission of this application) of public agencies that are authorized by the State in which the project is located to plan for the development of the area surrounding the airport."

35.     As owner and operator of the Airport, the City of Ann Arbor is the sponsor of the grant agreements and is responsible for compliance with the FAA's Grant Assurances.

36.     Upon information and belief, Ann Arbor has applied for, accepted, and used Federal funds for the Airport, including for the Project.

-11-

37.     In fact, upon information and belief, Ann Arbor, as applicant, and MDOT, as the lead agency, have applied for, approved, and/or received federal funds to prepare *three* Environmental Assessments ("EA") for the Project. Congress, though, has stated that the federal government may not fund "*a project*" for which "other Government assistance has been granted." 49 U.S.C. § 47110(b)(4). The FAA concluded that "[i]n other words, the costs must not be paid for by the Federal government more than once." FAA AIP Handbook, Chapter 3, Section 15, 3-104.

38.     By accepting a federal grant, applicants take on the fiduciary responsibility to ensure the money is spent to achieve the grant's intent. By providing federal funding for three EAs for the same project with federal taxpayer dollars, the Defendants had a significant, unfair, and illegal advantage. Plaintiffs were forced to dedicate local taxpayer dollars and/or solicit private citizen donations to fight and protect Pittsfield residents.

**FACTUAL BACKGROUND**

39.     Ann Arbor Municipal Airport (the "Airport" or "ARB") is owned and operated by the City of Ann Arbor but is wholly located within the township limits of Pittsfield Township. Operation of the Airport is subject to an Agreement between the City of Ann Arbor and Pittsfield Township. *See* Exhibit 1.

40.     Plaintiffs' opposition to the proposed project dates back to the first time Ann Arbor proposed to extend the runway that would allow bigger and noisier aircraft into the Airport. On January 22, 2007, the Ann Arbor City Council unanimously approved Resolution R-31-1-07, formally adopting the Airport's previous Airport Layout Plan (ALP) and called for "staff to bring back a separate proposal regarding extending the runway within the next 60 days

and that notification of the proposal be sent out to citizens in the surrounding area." Exhibit 6; *see also* Exhibit 33.

41.     Unfortunately, not only did the City's staff not return to a public council meeting within 60 days with an expanded runway plan, but the City's staff also failed to inform "citizens in the surrounding area" of its actions for twenty months. Instead, on February 28, 2007, just 37 days after its initial City Council Resolution order, the City Staff, citing the Resolution as a basis, submitted a proposal for an 800-foot extension of primary Runway 6/24 at ARB to the Michigan Department of Transportation – Aeronautics Division (MDOT). Exhibit 7. No corresponding notice was given to Pittsfield or to the "citizens in the surrounding area."

42.     On September 12, 2007, the proposed ALP was amended at the request of MDOT to allow for an 800-foot extension of Runway 6/24, and a 150-foot southwesterly movement of the entire primary runway. The ALP also provided for the widening of State Street-State Road, which MDOT conceded could not be funded for decades. Neither Pittsfield nor the "citizens in the surrounding area" were informed by Ann Arbor or MDOT about the proposed ALP, which calls for an extension of Runway 6/24 on land within Pittsfield's jurisdiction. The ALP was finally approved by MDOT on April 23, 2008, and presented to the Federal Aviation Administration for approval on June 4, 2008.

43.     In a June 23, 2008, letter from David L. Baker, Manager, AIP Programs of MDOT's Airports Division of the Bureau of Aeronautics and Freight Services, MDOT indicated to the City that the FAA concurred with the approval of the ALP. Yet neither MDOT nor FAA informed Pittsfield or the citizens of the surrounding area of either MDOT's or the FAA's approval of the ALP.

-13-

44.     In fact, it was not until August 22, 2008, that the City first officially provided Pittsfield with the plans and notification of the proposed ARB expansion and detailed proposed changes in the ALP. Exhibit 24. These documents were required to be provided to Pittsfield more than 18 months earlier under both the January 2007, Ann Arbor City Council Resolution and under a separate 1979 Policy Statement.[1] *See* Exhibit 6 and 4, respectively.

45.     This is also contrary to the grant assurances that the City agreed to, which indicate that prior to receiving any federal funds for the Airport Layout Plan, it must give "fair consideration to the interest of communities in or near where the project may be located" (Grant Assurance 7). *See also* Grant Assurance 6.

46.     It is noteworthy that the August 22, 2008, notification from Ann Arbor to Pittsfield is dated 60 days *after* MDOT approved the revised Ann Arbor Airport ALP. *See* Exhibit 41 (Letter from MDOT to Ann Arbor approving Airport Layout Plan, dated June 23, 2008). Under 49 U.S.C. § 46110, routine appeals of final agency "orders" are barred after 60 days. Thus, Pittsfield was effectively barred from legally objecting to the Ann Arbor ALP before even being notified by Ann Arbor about its revised ALP.

47.     Unable to file a legal action to stop the City from moving forward with its illegal ALP, Pittsfield responded to Ann Arbor's August notice, objecting to the proposed expansion, citing the: (1) increased noise that would be generated, (2) larger aircraft that would be attracted, (3) greater use by heavier aircraft that could result, (*See* Exhibit 25) and (4) the increase in dangerous leaded fuel emissions from piston-driven aircraft, which comprise upwards of 95

---

[1]     The 1979 policy states, *inter alia*, that "[p]lans for municipal construction on Airport lands must be submitted to the Township for review and comment."  Exhibit 4, p.3. The 1979 Policy was amended after the modification of the ALP.  Exhibit 5. The amendment makes clear what Pittsfield already thought was plainly obvious under the 1979 policy - that the City must notify Pittsfield prior to modifying the ALP. *See* Exhibit 5, p.2, ¶ 4.

percent of ARB operations.[2]  Despite Pittsfield's opposition to the proposed expansion of ARB, the Ann Arbor City Council approved the revised Ann Arbor ALP on September 22, 2008, without considering Pittsfield's objections, or those of Lodi Township, another township less than two miles west of ARB and in its direct traffic pattern.

48.    On March 24, 2009, Pittsfield unanimously approved a Resolution Opposing Proposed Expansion of the Ann Arbor Municipal Airport Runway. Exhibit 8. That Resolution cites several reasons why the runway at ARB should not be expanded. Primary among those reasons is the fact that ARB is "immediately adjacent to a residential area" and that the existing "width and length" of the runway "has not posed any substantial safety concerns in the past."  *Id*. In addition, the Resolution states that:

A.    The proposed changes would shift the runway dangerously close to a busy township road (Lohr Road) and closer to dense residential subdivisions;

B.    The runway expansion will significantly increase air traffic volumes and noise pollution experienced by residential subdivisions in the vicinity of ARB, thereby resulting in a decline of residential home property values and impacting Pittsfield's tax base;

C.    The City has not fully demonstrated the economic and safety justifications for undertaking the proposed runway expansion;

D.    The City has not taken into consideration the negative safety implications such a runway expansion may impose on surrounding residential subdivisions by expanding a runway closer to residential subdivisions.

*Id*.

49.    Lodi Township, which is adjacent to Pittsfield on the west side and also impacted by ARB, passed a similar resolution on May 12, 2009. Exhibit 9. Ann Arbor, MDOT and the FAA did not respond to either Pittsfield or Lodi Townships' resolutions, despite repeated

---

[2]    It should also be noted that the new ALP raises the weight limit of aircraft at ARB from 20,000 pounds to 45,000 (single axle) and 70,000 (double axle). Exhibit 33.  This change was never discussed by the Ann Arbor City Council, who, upon information and belief, still believes that the weight limit at ARB is 20,000 pounds.

requests to consider the communities' input into the proposed revision of the ALP and the proposed expansion of ARB.

50.     On June 17, 2009, the FAA issued a Notice of Intent to Prepare an Environmental Assessment and Conduct Citizen Advisory Meetings. *See* Exhibit 10. Although the Notice of Intent stated that "[d]uring development of the draft EA, a series of meetings to provide for public input will be held to identify potentially significant issues or impacts related to the proposed action that should be analyzed in the EA" (*id*. (emphasis added)) the only real opportunity for any public discussion -- with elected public officials present -- about the proposed expansion plan was before the Ann Arbor City Council, where speakers must call-in to register in advance. Only the first ten callers on the day of Council meetings are permitted to speak. Speakers are limited to three minutes. Such a process typically has a stifling effect on open and candid discussions for subjects as complex as an airport ALP and runway expansion proposal.

51.     One avenue for the public to influence ARB's and MDOT's decision was through the Airport Advisory Committee ("AAC"). But the AAC is also heavily weighted in favor of ARB's interests. Although both Pittsfield and Lodi Township have "ex officio" members on the AAC, they have no voting power, and the Mayor of Ann Arbor appoints the remaining members. *See* Exhibit 3. Even if Pittsfield and/or Lodi Township did have voting powers, the AAC has no decision-making authority, and can only recommend actions to be taken. *Id*. During the period in between the FAA's Initial Notice and the publication of the draft EA, the AAC met five times. However, the AAC also limits the time that the public can speak to only three minutes. Thus, it was impossible for the AAC to receive all the information it needed to make well-reasoned decisions and recommendations with respect to the extension of Runway 6/24 at ARB.

52.     On March 19, 2010, the FAA issued its Notice of Availability of Draft Environmental Assessment concerning the expansion at ARB. *See* Exhibits 16 and 22. The FAA's Notice of Availability indicated that written comments would be received by MDOT until 5:00 p.m. EST April 12, 2010. In addition, the FAA's Notice of Availability indicated that there would be a "public hearing to provide information on the draft EA and accept comments from the public" on March 31, 2010. Public hearing was required under 49 USC 47106 (c) "to consider the economic, social, and environmental effects of the location and the location's consistency with the objectives of any planning that the community has carried out."  However, the "public hearing" actually was a three-hour "open house" held during the dinner hour period between 4-7 pm at which various exhibits highlighting portions of the EA were presented as a "poster session," and during which individuals could assemble and provide public comments in response to the Environmental Assessment.

53.     Local media announcements of the event encouraged citizens to send comment letters directly to the Airport Manager, rather than MDOT, until Plaintiffs intervened and requested that MDOT correct the process and have comment letters submitted to MDOT directly. At the session itself, there was no dais of public officials impaneled to answer the public's numerous questions. There were no open, public statements with the media present. All testimony was given in private rooms to court reporters, to be forwarded to MDOT for later evaluation and, presumably, incorporation into the final EA.

54.     Both Pittsfield and CPCQ submitted comments to the draft EA on April 19, 2010[3] outlining in great detail the inadequacy of the draft EA and the need for a proper Environmental Impact Statement instead of an Environmental Assessment. *See* Exhibits 17 and 18.

---

[3]     MDOT and FAA extended the comment period from April 12, 2010, until April 19, 2010.

55.     The Washtenaw County Water Commissioner also submitted comments to the draft EA, expressing serious concerns regarding inaccurate statements and the failure of the draft EA to address critical water resources issues with respect to the proposed project. *See* Exhibit 19.

56.     The Washtenaw County Water Commissioner was not alone in having reservations about the Project. On May 13, 2010, the Federal Aviation Administration also submitted comprehensive comments on the draft EA, raising a host of serious issues that the draft EA left unaddressed. *See* Exhibit 20.

57.     In particular, the FAA expressed its doubts of the Project's qualifying as a "safety" project, when the draft EA does not present any evidence for the need for the safety improvements detailed in the draft EA. These relate to the shifting of the runway 150 feet to the southwest so that sight lines between the Air Traffic Control Tower and the aircraft on the taxiway could be improved as well as allowing for the implementation of 34:1 approach instead of the current 20:1 approach.

58.     In its November 15, 2010, response, MDOT seems to abandon all the safety improvements to the airport as being part of the "purpose and need," while still maintaining that 950 feet of impervious surface needs to be added to the southwest end of the Runway 6/24. *See* Exhibit 21. Safety also was not mentioned in the narrative text of the final EA, although Ann Arbor still refers to the Project as the "Runway Safety Extension Project" in actions before its Airport Advisory Committee and/or City Council contrary to its own FEA and FAA determinations. *See, e.g*., Exhibit 26 (Item "D-3 – Runway Safety Extension Project – Environmental Assessment").

59.     The issue of lighting at ARB also raised FAA's concern. Since the FAA owns and controls the lighting at ARB, the relocation or replacement of the current approach lighting

system as well as the development for future approach procedures for the new runway end

locations is solely a federal action not within the scope of MDOT's block grant authority. Yet,

the FAA points out, the draft EA fails to cover the environmental impact that the relocation

and/or replacement of the approach lighting would have. *See* Exhibit 20, p.1.

60.     Finally, the FAA requested that additional information be submitted regarding the

number of critical aircraft using ARB and how ARB arrived at its conclusion that there were

over 500 itinerant operations of the critical aircraft at ARB to justify the extension of the runway.

The FAA concluded its comments by stating:

> Since there are several updates/clarifications requested by the FAA
> contained in this letter and the sponsor's responses may be
> substantial, it would be prudent to afford the public an additional
> opportunity to review and comment on the changes that are
> anticipated to be made for the final draft publication. Most
> specifically, the document will need to clearly outline the requested
> local, state and federal actions. Since this was not clearly presented
> in the initial draft EA, the FAA may consider these changes and
> clarifications as a material change to the document that should result
> in solicitation of additional public comment.

Exhibit 20, p.9.

61.     However, the FAA and MDOT failed to finalize the 2010 Draft EA.

**PETITION TO THE SECRETARY OF TRANSPORTATION**

62.     49 U.S.C. § 47106(c)(1)(A)(ii) states that the Secretary of Transportation may

approve a grant application only if the sponsor certifies that it "has advised the communities [in

which the project is located] that they have the right to petition the Secretary [of Transportation]

about a proposed project."

63.     Pursuant to that right to petition, on January 28, 2013, Pittsfield Township and

CPCQ filed their Petition to Deny Approval and Funding for the Major Runway Extension

Project at Ann Arbor Municipal Airport ("ARB") Located in Pittsfield Charter Township, Michigan ("Petition") with the Secretary of Transportation. *See* Exhibit 14.

64.     In that Petition, Pittsfield Township and CPCQ raised numerous issues that the FAA needed to address, including:

   a.     Neither MDOT nor the FAA has given the interest of the communities surrounding ARB "fair consideration," as required by federal law.

   b.     There is no aviation safety need to extend Runway 6/24 at ARB by 950 feet, including the fact that Willow Run Airport (YIP), which has a 7,500+ foot runway, is a mere 12 miles away and has the capacity to take any larger aircraft.

   c.     The extension of Runway 6/24 will cause significant environmental and public safety impacts on the surrounding communities.

65.     The Acting Associate Administrator of the FAA responded on December 31, 2013, that "[t]he Secretary [of Transportation] has delegated the authority to address Title 49 U.S.C., § 47106(c)(l)(A)(ii), to my office. (Title 49 Code of Federal Regulations, § 1.83.) After careful review, the Federal Aviation Administration (FAA) has determined that the submission does not contain a basis for FAA review or action under § 47106(c)(l)(A)(ii)." *See* Exhibit 15. The letter further indicated that no environmental determination in connection with the proposed runway extension has been made." *Id*. Pittsfield understood this to mean that no "final action," as that term is used in 49 U.S.C. § 46110, was taken by the FAA because the environmental assessment had not been finalized and no Record of Decision had been issued.

## SECOND ATTEMPT AT AN ENVIRONMENTAL ASSESSMENT

66.     From 2010 through 2016 MDOT and the FAA went back and forth on revisions to the 2010 DEA. Finally, in 2016, the FAA, upon information and belief, told MDOT that they would have to issue a new draft environmental assessment since the 2010 DEA had expired.

67.     In May 2016, the FAA provided feedback on the draft Environmental Assessment, asking MDOT and Ann Arbor whether "the purpose [is] to meet 'FAA design criteria' or to accommodate the runway length needed by critical aircraft? This is implying that FAA is forcing the runway extension." *See* Exhibit 37.

68.     In addition, the FAA comments that "all references to 'FAA design objectives' be removed . . . the purpose should not be to meet FAA design objectives or put the onus on the FAA causing the runway length . . ." *See* Exhibit 26, at p. 3.

69.     A little later in the same document the FAA asks MDOT and Ann Arbor if the larger aircraft must take less cargo or fewer passengers because of the shorter runway at Ann Arbor "[w]hy do they base at ARB instead of another closer airport . . .?" *See* Exhibit 27 at p. 2.

70.     FAA continues, "[d]oes the fact that B-II aircraft still land at ARB instead of nearby YIP demonstrate that the restrictions put on those aircraft are not significant, otherwise these users would land at YIP instead?" *See* Exhibit 27, p. 6.

71.     The FAA points out, for the first time, that the "need is to allow aircraft to operate at 'optimum capabilities,' should this include why there's a need to operate at 'optimum capabilities'? Where are the aircraft going, how often is the runway length affecting users?" *See* Exhibit 27 p. 2.

72.     None of these questions were answered by MDOT or Ann Arbor either in the 2016 DEA or the current 2023 FEA.

73.     In October 2016, MDOT and ARB completed a "revised and updated" draft Environmental Assessment ("2016 DEA"). *See* Exhibit 28. However, it was not until December 2016, that MDOT issued its Notice of Public Information Meeting Ann Arbor Municipal Airport Environmental Assessment concerning the expansion at ARB. *See* Exhibit 29.  This Notice indicated that written comments would be received by MDOT until 5:00 p.m. EST February 10, 2017.

74.     The Notice indicated that there would be a "Public Information Meeting to answer questions regarding the revised EA, or the Preferred Alternative, and to solicit constructive input from interested citizens regarding the social, economic, and environmental impacts of the proposed improvements" on January 26, 2017. *See* Exhibit 29 However, the "public information meeting" was, again, a two and a half hour "open house" held, again, during the dinner hour period between 4-6:30 p.m. with exhibits of various EA sections presented, during which individuals could assemble and provide public comments to a court reporter in response to the Environmental Assessment. *Id*. There was no formal presentation, no elected officials took questions or provided answers in a public forum to which they could be held accountable by the public and the media.

75.     Although there were minor changes to the substance in the new 2016 DEA, the "preferred alternative" was the same as the 2010 DEA: extending the 3,505-foot runway by 945 feet, making the end of the runway closer to the residential area immediately to the west of ARB. *See* Exhibit 38.

76.     On February 10, 2017, Pittsfield and CPCQ submitted comments (Exhibit 30), including the following:

a. There is no need for the runway extension because the "critical aircraft" used in the 2016 DEA does not meet the criteria for "critical aircraft" as set by the FAA.

b. There is no need for the runway extension because any aircraft that must carry less cargo, or fuel or fewer passengers because of the 3,505-foot runway can use Willow Run Airport, a mere 12 miles away (15-minute drive by car).

c. There is no need for the runway extension because the extended runway would rarely be required but could pose risks to the surrounding community and Ann Arbor's water supply every day.

d. The extension of the runway could cost local authorities millions in losses from reduced taxes due to lower property valuations.

e. All reasonable alternatives to the runway extension were not considered, including the use of Willow Run Airport as an alternative for larger aircraft.

f. Ann Arbor is in violation of its contractual grant assurances by not giving fair consideration to the interests of local communities.

g. The 2016 DEA fails to properly assess the environmental impact on the surrounding communities, particularly with respect to noise and water resources.

Exhibit 40.

77. In a second Resolution, on April 12, 2017, Pittsfield unanimously passed a *second resolution* opposing the proposed major extension of the runway, adding that the proposed

project would increase air pollution, cause groundwater contamination, pose increased aircraft accident risks from Canada Geese, which inhabit the area for much of the year, and would detract from recent Washtenaw County investments enhancing the nearby Willow Run Airport area. *See* Exhibit 31.

78.     Upon information and belief, the FAA sought to address several outstanding issues it had regarding the draft EA, notably how many aircraft had to lighten loads due to the length of the runway. Upon information and belief, neither MDOT nor Ann Arbor provided the FAA with that information.

79.     Once again, MDOT and FAA failed to finalize the 2016 DEA.

**THIRD ATTEMPT AT AN ENVIRONMENTAL ASSESSMENT**

80.     On April 15, 2019, MDOT sent a letter to Pittsfield indicating that it was still attempting to extend the runway at the Airport. MDOT's letter requested Pittsfield's input regarding the runway extension. *See* Exhibit 32.

81.     On May 30, 2019, Pittsfield submitted its response to that letter. See Exhibit 33. Again, Pittsfield emphasized its long-standing opposition to the extension of the runway. Pittsfield told MDOT's contractor that it "has been opposed to lengthening the runway at Ann Arbor Municipal Airport … for social, economic and environmental reasons since the Airport first announced its intention to extend the runway in 2007. Extending the runway defies Pittsfield Township's Resolutions opposing such an expansion. It will cause issues with the Township's noise ordinance. And the Township will lose millions of dollars in tax revenues … What makes this situation worse is that the runway extension is not needed." *See* Exhibit 33, p.1.

82.     In the 2019 letter once again Pittsfield gave numerous reasons why the runway should not be extended:

a.    There is no "purpose" or "need" for extending the runway, since any

larger aircraft could be safely accommodated at Willow Run Airport.

Using Willow Run Airport, Pittsfield pointed out, should be considered a

"reasonable alternative" that must be fully analyzed as part of an

environmental assessment.

b.    Extending the runway will result in an increase in violations of Pittsfield

Township's ordinances and planning procedures.

c.    The alleged "safety" issues that the extension claims to resolve do not

justify the extension of the runway considering the increase in dangers to

the surrounding communities.

Exhibit 43.

83.    Once again Pittsfield's concerns about the Project were ignored by MDOT and

Ann Arbor and on November 13, 2022, Ann Arbor announced that the Draft Environmental

Assessment for the proposed project was available and that a "public hearing" would take place

on December 13, 2022, in Ann Arbor City Council Chambers. *See* Exhibit 34

84.    4. Once again, the public hearing was an "open house format with no formal

presentation given. Members from the project team will be available to answer questions on an

individual basis." *Id*. Without any formal presentation with questions from the public, the public

lacked the ability to make their position known to the decision makers on the project. *Id*.

85.    While there were minor changes to the substance of the Environmental

Assessment and the proposed project it remained essentially the same project as the one first

proposed in 2010. *See* Exhibit 35. One critical difference between the 2022 Draft EA and the

previous Draft EAs is the absence of any mention that the project was being proposed to address

safety concerns. Instead, the purpose of the proposed action is simply "to improve operational utility of the Airport." *See* Exhibit 35, § 1.5.1.

86.    On January 18, 2023, Pittsfield and CPCQ filed their comments on the Draft EA. Exhibit 36. Neither MDOT nor the FAA addressed the issues raised by Pittsfield and CPCQ in their previous comments, including the fact that an airport a mere 12 miles away could accommodate any aircraft that could not land or take-off from Ann Arbor due to runway length. In addition to the issues raised in the previous comments, Pittsfield and CPCQ also raised new issues:

    a.    NEPA requires that a Health Risk Assessment be drafted for the Project.

    b.    Noise from aircraft, particularly high-performance jets, has not been sufficiently analyzed by MDOT.

    c.    Technical and scientific data support the finding that aircraft noise is detrimental to public health and welfare by causing health risks to people living under flight paths, such as an increased risk of (1) cardiovascular disease, hospitalizations, and mortality; (2) hypertension (3) dementia in older individuals.

    d.    In addition, aircraft noise causes sleep disturbance for those who live under the flight paths. It has an impact on children's learning as well as being linked to low birth weight.

    e.    FAA's recent Neighborhood Environmental Survey underscores growing community annoyance with aircraft noise.

    f.    WHO Environmental Noise Guidelines for European Region (October 2018) establish new, science-based thresholds of significance.

       g.      MDOT and ARB must protect the surrounding community from aviation noise.

       h.      Extending the Runway will result in an increase in violations of Pittsfield Township's ordinances and planning procedures and is a violation of agreements between Ann Arbor and Pittsfield.

See Exhibit 36.

87.     In addition, Ann Arbor has been inconsistent with its stance regarding noise and emissions. In December 2023, Ann Arbor enacted a city-wide ban on gas-powered leaf blowers to reduce noise pollution, decrease greenhouse gas emissions, and improve community health (https://library.municode.com/mi/ann_arbor/codes/code_of_ordinances?nodeId=TITVIFOHE_CH75LEBL), and yet the city apparently has no such concerns when it comes to the health effects on neighbors across its borders in Pittsfield Township of noise and leaded gas-emission pollution from aircraft using Ann Arbor's airport, even though "air currents can carry pollution" across borders. *EPA v. EME Homer City Generation, L. P.,* 572 U.S. 489, 496 (2014).

88.     MDOT,  which is obligated to follow "reasoned decision making" (*Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024), citing, *Michigan v. EPA*, 576 U.S. 743, 750 (quoting *Allentown Mack Sales & Service Inc. v. NLRB*, 522 U.S. 359, 374), issued the Final Environmental Assessment ("FEA") on October 5, 2023 (Exhibit 39), and a Finding of No Significant Impact/Record of Decision ("FONSI/ROD") on October 16, 2023, (Exhibit 38) for a Proposed Runway Extension Project at the Ann Arbor Municipal Airport, Ann Arbor, Michigan (the "Project"). The notice of Availability of the FEA and FONSI/ROD was issued on December 1, 2023. *See* Exhibit 37.

89.     MDOT's stated purpose for the Project is to "improve operational utility" of the Airport – not safety or efficiency – by meeting takeoff and landing runway length "requirements" of aircraft that allegedly currently operate at the Airport and are projected to gradually increase operations over time. *See* Exhibit 39, § 1.5.1, p.1-7.

90.     MDOT's FEA for the Project was required to be prepared to comply with the requirements of NEPA to evaluate the environmental effects of the Project, and to comply with its legal obligations under the 2010 MOA.

91.     As the proponent of a proposed federally funded project and owner/operator of the Airport, the City of Ann Arbor was required to comply with the requirements of NEPA, the Clean Air Act, and the Federal Aviation Act.

92.     On July 17, 2024, the Ann Arbor Airport Advisory Committee voted unanimously (Pittsfield and Lodi Township's representatives on the Committee are barred from voting) to recommend that the Ann Arbor City Council vote to accept FAA-MDOT grant funds to hire a contractor to begin planning and design work on the "Runway Safety Extension Project." *See* Exhibit 40, pp.2-3.

## COUNT I
## MDOT LACKED THE LEGAL AUTHORITY TO APPROVE THE PROJECT
(Federal Aviation Act - MDOT)

93.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 92 above as if set forth fully at length herein.

94.     Michigan is one of ten states that administers Airport Improvement Program ("AIP") grants under the FAA's State Block Grant Program ("SBGP"). The SBGP, authorized under 49 U.S.C. § 47128, and 14 C.F.R., Part 156, requires, among other things, that the FAA issue a:

....

> (4)     finding that the State has agreed to comply with United States Government standard requirements for administering the block grant, including the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), State and local environmental policy acts, Executive orders, agency regulations and guidance, and other Federal environmental requirements; and
>
> (5)     finding that the State has agreed to provide the Secretary with program information the Secretary requires.

49 U.S.C. § 47128(a).

95.    Pursuant to that statutory provision, the State of Michigan and the FAA entered into a Memorandum of Agreement ("MOA") in 1993. That MOA was replaced by an MOA in 2010, which expired by its own terms in 2015. Upon information and belief, there have been no subsequent MOAs regarding the SGBP since 2010.

96.    In the absence of a valid Memorandum of Agreement between the FAA and the State of Michigan, when MDOT approved the FONSI/ROD on October 23, 2023, it lacked the legal authority to approve the project in question for funding through the FAA's State Block Grant Program.

97.    As a result of MDOT's lack of legal authority to approve the project in question for funding through the FAA's State Block Grant Program, the FONSI/ROD is arbitrary and capricious and not in accordance with the law and must be vacated.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendant and grant such other and further relief as the Court deems appropriate and just.

## COUNT II.
## ANN ARBOR FAILED TO NOTIFY PITTSFIELD TOWNSHIP OF ITS RIGHT TO PETITION THE SECRETARY
(Federal Aviation Act - Ann Arbor)

98.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 97 above as if set forth fully at length herein.

99.     49 U.S.C. § 47106(c)(1)(A)(ii) states that the Secretary of Transportation may approve a grant application only if the sponsor certifies that "the airport management board has voting representation from the communities in which the project is located or has advised the communities that they have the right to petition the Secretary [of Transportation] about a proposed project."

100.    The Airport has an advisory committee, called the "Airport Advisory Committee" ("AAC"). The mission of the AAC is "to gather and analyze information regarding the airport and the property it occupies, and to make relative recommendations to the City Council and other City officials." https://www.a2gov.org/departments/fleet-facility/Airport/Pages/AirportAdvisory.aspx.

101.    The AAC consists of seven individuals, serving three-year terms, who are designated by the Mayor of Ann Arbor and approved by the Ann Arbor City Council. AAC Bylaws, Sec. II.1. Pittsfield Charter Township and Lodi Township may each name an ex-officio *non-voting* member to the AAC. AAC Bylaws, Sec. II.2.

102.    Since neither Pittsfield nor Lodi Township have voting representation on "the airport management board," the sponsor was required to certify that they have a right to petition the Secretary of Transportation about the Project.

-30-

103.    Ann Arbor, as the sponsor, must make the certification. Neither Pittsfield Township nor CPCQ have been advised of their right to petition the Secretary about a proposed project by the City of Ann Arbor.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and grant such other and further relief as the Court deems appropriate and just.

**COUNT III**
**VIOLATIONS OF THE FEDERAL AVIATION ACT, AS AMENDED**
(MDOT and Ann Arbor)

104.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 103 above as if set forth fully at length herein.

105.    It is "the policy of the United States that aviation facilities be constructed and operated to minimize current and projected noise impact on nearby communities." 49 U.S.C. § 47101(a)(2). Congress explained that "[i]t is in the public interest to recognize the effects of airport capacity expansion projects on aircraft noise. Efforts to increase capacity through any means can have an impact on surrounding communities. Non compatible land uses around airports must be reduced and efforts to mitigate noise must be given a high priority." 49 U.S.C. § 47101(c).

106.    The FAA has long recognized that extending a runway is a "capacity enhancement" that requires capacity planning and development. For example, in FAA Order 5090.5, the FAA states that a "[r]unway extension to accommodate more demanding aircraft," which is the situation at the Airport. is an activity that may trigger capacity planning and development. FAA Order 5090.5, p. 4-16.

107.    In contravention to FAA Orders and the Federal Aviation Act, the FEA does not account for the increase in aviation noise that will be created by: (1) the increase in capacity at

-31-

the Airport and (2) aircraft flying over residential neighborhoods at lower altitudes as a result of the runway shift and extension toward those neighborhoods to the west of the airport.

108.    MDOT has failed to comply with these requirements of the Federal Aviation Act of 1958 (Title 49, U.S.C., subtitle VII, as amended) by failing to protect residents and property owners from the deleterious effects of noise and its decision to approve the Project was, therefore, arbitrary and capricious and not in accordance with the law.

109.    In violation of 49 U.S.C. § 47110(b)(4), Ann Arbor requested and received federal funds for the same project twice. Upon information and belief, Ann Arbor received federal funds to conduct three environmental assessments of the same proposed project – the runway extension – for the 2010 Environmental Assessment, the 2016 Environmental Assessment and the 2022 Environmental Assessment. Moreover, this is in violation of FAA policy "[i]n other words, the costs must not be paid for by the Federal government more than once." FAA AIP Handbook, Chapter 3, Section 15, 3-104.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and grant such other and further relief as the Court deems appropriate and just.

## COUNT IV
## DEFINING THE PURPOSE AND NEED SO NARROWLY AS TO PRECLUDE CONSIDERATION OF ALL REASONABLE ALTERNATIVES
(NEPA – MDOT and Ann Arbor)

110.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 109 above as if fully set forth at length herein.

111.    NEPA requires that the environmental document specify the underlying "Purpose and Need" to which the agency is responding in proposing the alternative including the proposed action. 40 C.F.R. § 1502.13.

112.    An agency may not define a purpose and need statement in terms so narrowly that it makes the selection of a particular alternative a foreordained conclusion. *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011) (purpose and need statement is impermissibly narrow and will be rejected if the definition of objectives "compels the selection of a particular alternative") *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.,* 606 F.3d 1059, 1072 (9th Cir. 2010) (as a result of an unreasonably narrow purpose and need, BLM considered an unreasonably narrow range of alternatives); *Simmons v. US Army Corps of Engineers*, 120 F.3d 664, 667 (7th Cir. 1997)(agency failed to comply with NEPA by defining impermissibly narrow purpose for project, therefore failing to consider a full range of alternative); *Davis v. Mineta*, 302 F.3d 1104, 1119 (10th Cir. 2002) (agency can reject alternatives that do not meet purpose and need but cannot "define the project so narrowly that is foreclosed a reasonable consideration of alternatives").

113.    By defining the purpose and need of the Project to be "to meet the operational needs of the critical aircraft," Defendants violated NEPA's requirements. The Purpose and Need for the Project is too narrow and precludes reasonable consideration of alternatives. For example, by defining the Purpose and Need so narrowly, the FEA failed to properly examine a more practical and reasonable alternative: to have aircraft that cannot use the existing Airport because of the short runway, fly from Willow Run Airport instead.

114.     Because the FEA defined the Project's Purpose and Need in such a narrow manner, Defendants unreasonably, arbitrarily, and capriciously restricted their consideration of alternative means of improving the transportation corridor to a narrow range of "alternatives" essentially identical to the Project. And, in so doing, they improperly restricted the scope of the entire FEA.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and grant such other and further relief as the Court deems appropriate and just.

**COUNT V**
**FAILURE TO CONSIDER ALL REASONABLE ALTERNATIVES**
(NEPA – MDOT and Ann Arbor)

115.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 114 above as if fully set forth at length herein.

116.     NEPA mandates that the environmental document identify, evaluate, and compare "all reasonable alternatives" to a proposed project. 40 C.F.R. § 1502.14; see also 42 U.S.C. § 4332(2)(C)(iii)(the environmental document shall include "a reasonable range of alternatives to the proposed agency action … that are technically and economically feasible …"). The CEQ NEPA Regulations explicitly state that the analysis of alternatives is the "heart" of an environmental impact statement. *Id*.

117.     Defendants also violated NEPA's requirements governing the analysis of alternatives by arbitrarily and capriciously failing to consider reasonable alternatives to the Project.

118.     For example, the FEA fails to consider:

    a.   the use of Willow Run Airport instead of ARB for those aircraft that do not wish to adjust their weight;

-34-

b.  the development of a new airport;

c.  the closure of the ARB; and

d.  Shifting the runway 150 feet to southwest to give the Air Traffic Control
    Tower a better view of aircraft at the end of the runway.

119.   The Defendants have failed to comply with the mandates of NEPA and the CEQ
Regulations by failing to consider all reasonable alternatives and, thus, its decision to approve
the Project was arbitrary and capricious and not in accordance with the law.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against
Defendants and grant such other and further relief as the Court deems appropriate and just.

**COUNT VI**
**FAILURE TO PROPERLY ANALYZE THE ENVIRONMENTAL CONSEQUENCES OF**
**ALTERNATIVES**
(NEPA - MDOT and Ann Arbor)

120.   Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 119 above
as if fully set forth at length herein.

121.   NEPA mandates that the environmental impacts be presented "of [] proposal[s]
and alternatives in comparative form, thus sharply defining the issues and providing a clear basis
for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. This
evaluation of environmental impacts must address all reasonably foreseeable direct, indirect, and
cumulative environmental consequences of the proposed federal action. 40 C.F.R. § 1502.16.

122.   Defendants have failed to comply with the requirements of NEPA regarding
environmental impacts resulting from the preferred alternative for the Runway 6/24 Extension
Program upon the Township of Pittsfield and its residents by:

a.  Failing to make effective disclosure of environmental impacts, including
    from aircraft noise and leaded-fuel emissions, to Pittsfield Township and

-35-

its residents which will result from MDOT's Preferred Alternative and by

failing to provide sufficient information to enable Pittsfield Township and

its residents to understand and evaluate the environmental impacts which

will result from MDOT's Preferred Alternative and the changes from

current conditions;

b.      By failing to provide Pittsfield Township and its residents with sufficient

scientific data and information and adequate explanation so that they can

meaningfully participate and be informed through the NEPA process and

determine whether MDOT's noise analysis and conclusions are

scientifically valid and unbiased;

c.      By failing to provide additional scientific data and information to Pittsfield

Township and its residents so that they can be assured that MDOT's

process for collecting and evaluating its noise data and MDOT's noise

conclusions are scientifically valid and unbiased, including MDOT's

failure to consider using Willow Run Airport for aircraft that need a longer

runway; and

d.      By failing to use the most current scientific methods in assessing

environmental impacts, the FEA lacks professional integrity, including

scientific integrity, as required by NEPA and the CEQ Regulations. 42

U.S.C. § 4332(2)(D); see also 40 C.F.R. § 1502.24.

123.    Because Defendants have failed to comply with the requirements of NEPA

regarding environmental impacts resulting from the preferred alternative for the Runway 6/24

Extension Program, the decision to approve the Project is arbitrary and capricious and not in accordance with the law.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and grant such other and further relief as the Court deems appropriate and just.

**COUNT VII**
**VIOLATIONS OF THE CLEAN AIR ACT**
(MDOT and Ann Arbor)

124.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 123 above as if set forth fully at length herein.

125.    The Clean Air Act states that "No department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title." 42 U.S.C. § 7506(c)(1); *see also* 40 C.F.R., Chapter I, Subchapter C, Subpart B *Determining Conformity of General Federal Actions to State or Federal Implementation Plans*.

126.    To receive federal funding, the Environmental Assessment must show that the Project will not cause new air quality violations, worsen existing violations, or delay timely attainment of the national ambient air quality standards.

127.    The FEA fails to show that the Project will conform to the applicable implementation plan. As a result, the Project cannot be approved.

128.    The Defendants have failed to comply with the requirements of the Clean Air Act, 42 U.S.C. § 7401 *et seq*. and its regulations. Therefore, the decision to approve the Project is arbitrary and capricious and not in accordance with the law.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and grant such other and further relief as the Court deems appropriate and just.

**COUNT VIII**
**VIOLATIONS OF FAA REGULATIONS AND ORDERS**
(MDOT and Ann Arbor)

129.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 128 above as if set forth fully at length herein.

130.    Both MDOT and Ann Arbor are required to comply with FAA's regulations and orders. *See supra* ¶¶ 26-35. This includes, but is not limited to the following FAA Orders:

  a.  FAA Order 1050.1F, Environmental Impacts: Policies and Procedures;

  b.  FAA Order 5050.4B, National Environmental Policy Act (NEPA Implementing Instructions for Airport Actions; and,

  c.  FAA Order 5190.6B, Airport Compliance Manual.

131.    The Defendants have failed to comply with the requirements of the FAA regulations and orders and, therefore, the decision to approve the Project is arbitrary and capricious and not in accordance with the law.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and grant such other and further relief as the Court deems appropriate and just.

**COUNT IX**
**VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT**
(MDOT and Ann Arbor)

132.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 131 above as if set forth fully at length herein.

133.    Due to MDOT's failure to comply with NEPA, Plaintiffs have suffered legal wrongs because of agency action and are adversely affected and aggrieved by agency action within the meeting of the APA, 5 U.S.C. § 702.

134.    MDOT's failure to comply with NEPA is arbitrary, capricious, and an abuse of discretion, not in accordance with law, and excess of statutory jurisdiction, and is without observance of the legal procedure required by law within the meaning of the APA, 5 USC § 706(2).

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and grant such other and further relief as the Court deems appropriate and just.

### COUNT X
### VIOLATIONS OF THE MICHIGAN ENVIRONMENTAL PROTECTON ACT ("MEPA"), MCL 324.1701-.1706
(Pendent State Claim)
(MDOT and Ann Arbor)

135.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 134 above as if set forth fully at length herein.

136.    MEPA authorizes any person to bring an action "for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction." MCL 324.1701(1).

137.    Here, the expansion of the Airport being undertaken by MDOT and the City of Ann Arbor is being done in violation of applicable environmental standards and will, at minimum, result in harm to both the air and water resources in Pittsfield Township and the surrounding communities.

138.     The environmentally harmful actions being taken by MDOT and the City of Ann Arbor are being done even though feasible and prudent alternative measures exist that negate the need for such actions.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and grant such other and further relief as the Court deems appropriate and just.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the court enter judgment in their favor as follows:

A.     Declaring MDOT's Environmental Assessment for the Runway 6/24 Extension Project violates the requirements of NEPA and the APA and is null and void and of no legal force or effect;

B.     Issuing an order requiring Ann Arbor to refund to the FAA and/or MDOT all federal grant funds received in connection with the 2016 Draft Environmental Assessment and the 2022 Draft Environmental Assessment;

C.     Issuing an order requiring MDOT to: (1) provide Pittsfield Township and its residents with the scientific data and information so they can assess the environmental impacts of the preferred alternative for the runway extension project upon Pittsfield Township and its residents, (2) revise and/or supplement MDOT Environmental Assessment for the Runway 6/24 Extension Project to address all environmental impact issues raised by Pittsfield Township and its residents and to consider alternatives to avoid and/or minimize the impact of the preferred alternative upon Pittsfield Township and its residents; and (3) consider

alternatives that will not cause environmental impacts, such as utilizing Willow Run Airport for aircraft that cannot use Ann Arbor's shorter runway;

D.    Issuing an order enjoining MDOT and the City of Ann Arbor from undertaking any actions to implement the Preferred Alternative for the Runway 6/24 Extension Project until these issues relating to the EA have been addressed and resolved;

E.    To award Plaintiffs the cost of this action, including attorney's fees; and

F.    Grant such other and further relief as the court deems just and proper.

Dated: August 7, 2024

Respectfully submitted,

LEECH TISHMAN FUSCALDO & LAMPL, LLC

By: */s/ Daniel P. Yeomans*
    Daniel P. Yeomans (P79303)
    525 William Penn Place, 28th Floor
    Pittsburgh, PA 15219
    Phone: 412.261.1600
    Facsimile: 412.227.5551
    dyeomans@leechtishman.com
    *Attorneys for Plaintiffs*